697 So.2d 728 (1997)
Nancy Carol PURCELL, Plaintiff-Appellant,
v.
Kenneth Wayne PURCELL, Defendant-Appellee.
No. 29663-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1997.
*730 Sam O. Henry, IV, West Monroe, for Plaintiff-Appellant.
Charles R. Joiner, West Monroe, for Defendant-Appellee.
Before MARVIN, C.J., and CARAWAY and PEATROSS, JJ.
MARVIN, Chief Judge.
In this action to partition community property, the plaintiff ex-wife (hereafter Mrs. Purcell or Nancy), appeals the trial court's judgment to complain that she was not reimbursed community funds allegedly expended to build a new family home in 1989 on separate property of her then husband (hereafter Mr. Purcell or Ken), and that her ex-husband was allowed a credit of $5,300 against the $7,629 equalizing payment owed by him to her. She also complains that the trial court failed to include in the community assets and assign value to a lawn mower in possession of her ex-spouse.
We amend the judgment in these respects: To allow Nancy the additional reimbursement of $6,947.58, representing one-half of the funds expended for construction of the new home which, since not proved to be separate, are presumed to be community funds, and to reduce the credit allowed her ex-spouse on the amended equalizing amount from $5,300 to $300.
As amended, the judgment is affirmed.

PREFACE
The marriage of the parties in 1977, which ended in divorce in 1994, produced a daughter born in 1979. With community funds the couple purchased their first family home in West Monroe in 1978. They sold this home in 1989, netting the community about $29,000. After construction of a new home on Ken's separate property began in March 1989, Ken deposited $29,000 on May 3, 1989, in an existing account designated as Ken Purcell he had with investment broker Edward D. Jones (hereafter Ken Purcell EDJ account), from which he could make withdrawals simply by writing checks. The existing EDJ account contained funds donated to Ken Purcell by his uncle, C.J. Byrd, before construction of the new home began in March 1989. The uncle made the donations in September 1988 specifically to defray the cost of constructing the new home.
During the marriage the couple maintained a community bank account, referred to as either the ONB or the Premier account. In the course of the construction, checks were sometimes written on the EDJ account either directly to contractors and material suppliers or to deposit funds into the ONB account for that purpose.
The commingling of separate and community funds required the trial court to resolve several factual and legal disputes about the source of what amounts were spent out of the accounts, when and for what expenses or purchases. The trial court's factual conclusions and credibility determinations are not disturbed. Civil Code principles and presumptions *731 resolve the legal disputes and cause our amendment of the judgment.

FACTS
With a written power of attorney, Ken Purcell managed his uncle's business affairs since April 1985. Ken produced records and explained that the initial Ken Purcell EDJ account originally derived from investments and funds donated to him by his uncle. Mrs. Purcell acknowledged that she knew that Mr. Purcell's uncle, C. J., had told Ken he would donate funds to pay the cost of constructing the new home.
Ken testified his uncle's donations to him totaled approximately $132,000. The records introduced at trial showed deposits totaling $126,202.50 in the EDJ account by March 1989 in addition to the $29,000 derived from the sale of the older home and deposited in the EDJ account on May 3, 1989. Ken said he received donations from his uncle in the amounts of $22,549 and $32,095 (a sub-total of $54,644), and $67,000, a grand total of $121,644. Copies of the cashier's checks for two of these amounts show that Ken received the donations in September 1988. The donations were either or both CD's and investments of the uncle.
We list the critical deposits in and withdrawals from both the EDJ account, excluding periodical interest accruals, and the ONB or Premier community joint checking account with footnotes to explain the manner in which these accounts were used:

 EDJ Account \V/ ONB Account
Date Description Amount Date Description Amount
2/29/89 Balance $56,472[1] 8/25/88[2] JHP Construction $110.22
3/21/89 Deposit $69,730[3] 9/21/88[2] House of Plans $100.00
3/31/89 Paid contractor ($34,106) 11/1/88[2] Eddie Pohlman-on $168.00
 statement 1
5/3/89 Deposit from house sale $29,000 11/1/88[2] Raymond Walters- $130.00
 statement 1
5/10/89 Paid carpet supplier ($2000) 11/18/88[2] House of Plans $1409.30
5/11/89 Purchase TCBY stock ($5235)[4] 11/26/88[2] Laymon Godwin $66.13
6/1/89 Purchase mutual fund ($24,015)[5] 6/19/89 Eddie Pohlman $1848.42
6/2/89 Paid contractor ($20,000) 6/29/89 Eddie Pohlman $150.00
6/3/89 Truck (Cooper GMC) ($3,185) 7/10/89 Delta Security $1250.00
6/6/89 Paid window blind supplier ($1,200) 8/9/89 Ashley Construction $22,000.00[6]
6/30/89 Paid contractor ($13,000) 8/11/89 Stuart Irby $342.81[7]
7/30/89 Paid contractor ($22,000)[6] 8/24/89 Stuart Irby $242.00[7]
8/8/89 Deposit to ONB account ($10,000)[7] 8/25/89 stuartIrby $13.517
8/24/89 Deposit to ONB account ($20,000)[8] 8/28/89 StuartIrby $545.97[7]
10/2/89 Deposit to ONB account ($2000)[9] 8/29/89 StuartIrby $81.66[7]
12/26/89 Deposit to checking ($500)[10] 8/31/89 Janice Rose $295.00[7]

*732
1/31/90 Deposit to ONB account ($2000)[11] 9/1/89 David Sellars $8000.00[7]
3/7/90 Deposit (not listed on $5000[12] 9/11/89 Acme Brick $2541.13[8]
 ledger)
3/7/90 Deposit to ONB account ($2501)[13] 9/11/89 Hill Interiors $5379.00[8]
3/30/90 Paid lien ($1200) 9/11/89 Basic Appliance $2178.00[8]
4/2/90 Deposit to ONB account ($1900)[14] 9/11/89 Delta Security $1413.00[8]
5/5/90 Deposit $1500[15] 9/14/89 Sanders Lumber $1000.00[8]
5/14/90 Nancy's tooth and lawyer ($1000) 9/14/89 Monroe Concrete $150.00[8]
7/10/90 School tuition, etc. ($500) 9/14/89 Slagle Johnson $245.00[8]
7/90 Balance $1060 9/14/89 Wallace Plumbing $450.00[8]
 9/14/89 C.D. Hodges $195.00[8]
 9/14/89 Century Ready Mix $400.00[8]
 9/14/89 May Supply $150.00[8]
 9/14/89 Kenneth Givens $150.00[8]
 9/14/89 Charles Terrell $750.00[8]
 9/14/89 Monroe Marble $500.00[8]
 9/14/89 Arklamiss Doors $250.00[8]
 9/14/89 Arkansas Stone $350.00[8]
 9/29/89 Slagle Johnson-statement 2 $245.00[8]
 9/29/89 Tom Sanders Lumber $1000.00[8]
 9/29/89 Century Ready Mix $400.00[8]
 9/29/89 May Supply $200.00[8]
 9/29/89 Kenneth Givens $200.00[8]
 9/29/89 Monroe Marble $500.00[8]
 9/29/89 Arklamiss Doors $725.00[8]
 9/29/89 Monroe Concrete $534.00[8]
 9/29/89 Tempco Insulation $431.00[8]
 9/29/89 Arkansas Stone $361.00[8]
 11/30/89 Laymon Godwin $65.06[16]
 12/4/89 Century Ready Mix $300.00[16]
 2/1/90 J. Parkerson-Wallace lien $1919.20[16]
 2/2/90 Century Ready Mix $1649.11[16]
 3/8/90 Monroe Sand & Gravel $70.59[16]
 6/24/90 Pallet of Grass $170.60[16]
 12/18/90 Laymon Godwin $675.23[16]
 2/28/91 D.R. McManus $140.00[16]
 5/18/91 Sunrise Landscape $887.60[16]
 10/22/91 Ouachita Lumber $372.91[16]
 12/1/91 Laymon Godwin $675.42[16]
After moving into the new home in September 1989, the Purcells occupied it until their separation in 1994 and divorce in 1995. In a hearing on July 5, 1994, in the divorce proceedings, the litigants stipulated to child custody details, the use of the family home by Nancy until the divorce, with Ken obligating himself to pay $500 per month child support and $500 per month alimony for the next five years, and a lump sum of $5,000 to be paid when Nancy vacated the family home. Ken explained that the $5,000 was designated as support and alimony for tax purposes, when in fact the obligation was made to help Nancy to purchase a vehicle. He claimed the payment was an advance against what he owed Nancy in the community property partition. The judgment of divorce is dated November 3, 1994, effective April 15, 1994. Nancy filed the action to partition the community property on January 12, 1995.
*733 On January 22, 1995, Nancy and Ken signed a written statement acknowledging that to defray Nancy's moving expenses, Ken was "advancing" to Nancy $1,000 of the $5,000 referred to in the July 5, 1994, stipulation. This statement also declared that Ken would pay the balance of $4,000 to Nancy upon her completing her move from the house, and if she did not do so, the $1,000 would be credited to Ken's monthly support or alimony obligations. Ken later gave Nancy $300 to purchase a television, receipt of which Nancy acknowledged.
The trial court appointed a notary-referee to analyze the assets and debts of the community and the disputed claims of the ex-spouses. The notary's October 6, 1995, detailed report to the court is contained in the record. After a trial on November 27, 1995, the court assigned written reasons for judgment on January 10, 1996, and signed the judgment on June 17, 1996.
In its written reasons for judgment, the trial court held the donations by Ken's uncle were donations to Ken individually and were his separate property. The trial court further found that commingling of donated and community funds did not cause the donated funds to lose their identity as Ken's separate property. The trial court denied Nancy's claim for reimbursement of community funds spent to improve Ken's separate lot. The court calculated that Ken owed Nancy an equalizing payment of $7,629.29, the value of movables allocated to Ken exceeding one-half of the total value of all the community property, but granted Ken a credit of $5,300 against this payment for the $5,000 "advance" and the $300 "T.V. advance" mentioned above. The court deleted from the calculation the value of a lawn mower which was in Ken's possession.
Nancy contends, both here and below, the uncle's donations were made to him and her, and in the alternative, if the donated funds are Ken's separate funds, the commingling of those funds with community funds caused the separate funds to lose their identity, entitling her to reimbursement of one-half of the total amount paid from the ONB account for construction costs of the new home. We address the issues raised by her contentions.

SEPARATE OR COMMUNITY DONATIONS
Things in possession of a spouse during the existence of the community are presumed to be community. La. C.C. art. 2340. The donated funds in question, of course, were acquired during the community. Art. 2340 provides the spouse may overcome the presumption by contrary proof that is clear and convincing. Tullier v. Tullier, 464 So.2d 278 (La.1985); Curtis v. Curtis, 403 So.2d 56 (La.1981); Burford v. Burford, 541 So.2d 341 (La.App. 2d Cir.1989).
Property which a spouse has acquired during the marriage by inheritance or donation to him or her individually is the acquiring spouse's separate property. Art. 2341. The identity of the donee or donees is controlled or determined by the intention of the donor. Allbritton v. Allbritton, 561 So.2d 125, 127 (La.App. 3d Cir.1990); Hamilton v. Hamilton, 381 So.2d 517, 518 (La.App. 1st Cir.1979).
The manual gift of corporeal movable effects, accompanied by a real delivery, is not subject to any formality. Art. 1539. The validity and character of a manual gift depends on the intention of the donor to give and the delivery of the thing to the donee.
The intention of the donor controls the identity of the donee or donees. The delivery may be made to the donee, or to one of them, if there be more than one, or even through a third party. See Aubry et Rau, Droit Civil Francais, Civil Law Translations, v. 3, s 659; Planiol, Traitee Eleementaire de Droit Civil, v. 3, part 2, s 2538 et seq. (Louisiana State Law Institute Translation); Faison v. Patout, 212 La. 37, 31 So.2d 416 (1947).
Hamilton v. Hamilton, supra, p. 518.
Resolution of the issue is a factual determination to be made by the trial court. We do not disturb that resolution on appeal unless the trial court's conclusion is found to be clearly wrong. Where there is conflict in the *734 testimony, reasonable evaluations of credibility and reasonable inferences of fact are not disturbed on review, even though the appellate court may feel that other evaluations and inferences are also reasonable. Terrell v. Terrell, 26,863 (La.App.2d Cir. 5/10/95) 655 So.2d 600.
When the donor is deceased, the intention of the donor is to be inferred from the relation of the parties and from all the facts and circumstances of the case. Succession of Zacharie, 119 La. 150, 43 So. 988, 990 (1907). In this case, Ken's uncle was not deceased, but by stipulation, was shown to be unavailable to both parties as a witness because of his advanced age, mental and physical health.
Some cases have pronounced that, in the absence of evidence of intent, the nature of the property, including the manner in which the gift was used, is relevant in deciding whether the property is separate or community. See Swilley v. Swilley, 489 So.2d 456 (La.App. 3d Cir.1986); Campo v. Dupre, 470 So.2d 234 (La.App. 4th Cir.1985); Hamilton v. Hamilton, supra.
Ken's mother, Myrtle Purcell, was allowed to say only that she and Ken's uncle were very close and had discussed the donations both before and after they were given. She was not allowed to repeat any statements to her by Mr. Byrd about his intent.
As earlier mentioned, Ken had handled his uncle's business affairs under a written power of attorney which was evidently signed in April 1985. Ken had continued to attend to his uncle's business. He likewise was precluded from testifying directly about statements his uncle may have made about the intended donee or donees.
Nancy testified that she only knew Ken's uncle through her marriage to Ken. She said during the marriage the family saw Mr. Byrd about twice a month and on holidays. She considered herself to be "close" to Mr. Byrd. After the divorce, she no longer saw him. She thanked Mr. Byrd for the donation but did not otherwise discuss the donation with him until after divorce proceedings began.
The record allows the inference that Ken and his uncle discussed the uncle's desire to make the donation and the details of fulfilling that desire as plans were made for the new home. Ken told Nancy about his uncle wanting to make the donation during their discussions concerning the sale of their first family home.
The trial court accepted Ken's testimony that he and Nancy discussed why the home would be his separate, rather than community property, built with funds donated to him by his uncle. He said they argued about this many times with Nancy wanting him to have a document prepared and executed that would give her an ownership interest in the home. Ken refused to do so, but agreed to, and did, execute a will leaving Nancy the usufruct of the home at his death. Nancy denied that any such discussions took place, and denied that she ever acknowledged that she was aware that she would not own an interest in the house. The trial court obviously made the credibility call against Nancy. We cannot find this call clearly wrong, especially in the light of Nancy's admissions and the fact that she was not involved in Mr. Byrd's business affairs and did not have access to the donated funds.
None of the donations was delivered to Nancy. They were delivered to Ken only. Ken placed the donated funds or investments in his own EDJ investment account on which only he was authorized to write checks. Until some of the EDJ funds were deposited in the ONB community account, Nancy had no access to the donated funds. As construction progressed on the new home, virtually all of the money from the EDJ account deposited to the ONB account was disbursed to the contractor or subcontractors from the ONB account within a few days or weeks of the deposit in the ONB account.
The donated funds were used to build a house on Ken's separate property inherited from his father. The home was Ken's separate property. La. C.C. art. 2366. The uncle made the donations specifically to pay the *735 cost of constructing the new home. We do not disturb the trial court's findings that the donations were intended for Ken individually and not for the community.

COMMINGLING
The trial court did not agree with Mrs. Purcell's contentions about the effect of commingling. While sometimes confusing and conflicting, the testimony and records allow the source and expenditures of money spent from each of the accounts to be traced and identified. Ken's testimony and bank records, about which Nancy appeared to have very little knowledge, allowed the trial court to resolve the commingling issues against Nancy.
After the new home was completed and occupied, some apparent or presumed community funds were deposited in the EDJ account to maintain a small balance. During that time the withdrawals from the account were used for community expenses, rather than on improvements or things for the new home. The expenditures on and for the new home totaled slightly more than the total of the proven donations from Mr. Byrd.
The $52,000 deposited from the EDJ account into the ONB joint checking account as construction progressed is readily identified by comparing the dates of the donations withdrawn from the EDJ account with the deposits into the ONB account and the dates, amounts and payees of the checks written on the ONB account to pay obvious construction costs. ONB checks for construction costs totaled $51,875.27 during the same time period that the $52,000 withdrawn from the EDJ account was deposited in the ONB account.
We do not find the trial court clearly wrong in its conclusion that the separate funds remained identifiable notwithstanding the "commingling" of the $29,000 community proceeds from the sale of the first home.

SOURCE OF FUNDS
Ken met his burden of proving receipt of the funds from his uncle and the expenditures from the EDJ account through the ONB account for construction costs by clear and convincing evidence, except for the amounts discussed hereafter. We have no evidence or suggestion that any sizeable community funds were available to cover the cost of constructing the new home. A working copy of a gift tax return for the 1988 tax year for Mr. Byrd suggests that the anticipated costs of the new home were $100,000. The record shows that Mr. Byrd made donations of $121,644 to Ken for that purpose in 1988.
Notwithstanding that the $29,000 proceeds from the sale of the older home theoretically provided a source of sizeable community funds for the construction of the new home, as Nancy argues, the record supports the trial court's conclusion that no portion of those funds was actually used for that purpose.
The check registers produced by Ken show that $29,000 was deposited in the EDJ account on May 3, 1989, followed by withdrawals of $5,235 on May 11, 1989 [for investment in TCBY stock] and of $24,015 in June 1989 [for investment in mutual funds]. The trial court accepted Ken's testimony that the source of the funds for these investments [$29,250] was the $29,000 first home proceeds and interest earned by the EDJ account, and that no portion of the $29,000 was spent on the improvement of Ken's separate property.
Nancy said part of the $24,000 mutual fund investment was spent on a car, her school expenses, and other items, but did not explain specifically what was expended for what purpose. She testified vaguely that she "thought" some of the money was used to pay liens, but could not say how much or to whom any amounts were paid. The court's acceptance of Ken's contention that no community funds were expended to construct the new home was not clearly wrong with respect to the $29,000. However, in the following respects, we do find clear error.
The record shows that the first deposit of EDJ funds into the ONB account occurred August 24, 1989.[17] The first checks [totaling *736 $5,232.07] written on the ONB account to contractors and material suppliers were dated from August 25, 1988 through July 10, 1989. Ken testified the checks on the ONB account in June 1989 to Eddie Pohlman were for repair of hail damage to a barn that was on the new homesite. He said insurance paid this damage. This is presumed community property. Since no money had yet been transferred from the EDJ account to the checking account, the $5,232.07 used for these transactions must be presumed to be community funds for which reimbursement is due. La. C.C. arts. 2340 and 2366.
The total construction-related payments out of the ONB account from August 11, 1989 through September 29, 1989 were $51,875.27. The $29,000 from the sale of the first home had already been withdrawn from the EDJ account before July 1, 1989. It is logical to conclude that the $51,875.27 expenditures were made with donated funds because the total amount transferred from the EDJ account to the ONB account during the same period was $52,000.
From November 30, 1989, through December 1, 1991, checks related to construction costs and other expenses for the house and lot were written on the ONB account in a total amount of $6,925.72. We do not have a corresponding transfer or deposit to the ONB account from the EDJ account during this time frame.
Based on the above review of the banking records, we must find that $12,157.79 expended from the ONB account for construction costs and property taxes for the new home was not paid from EDJ separate-donated funds, but with funds that are presumed community.
On March 30, 1990, an EDJ check was written for $1,200 to pay a "Terrel" lien. By this time, six months after the Purcells occupied the new home, their address had changed and the designation of the Ken Purcell EDJ account had apparently been changed to Ken and Nancy Purcell. Moreover, from October 27, 1989, the funds in the EDJ account were used to pay community debts and expenses, according to the notations in the register. By January 31, 1990, the balance in the EDJ account was only $590. Other deposits to the EDJ account are recorded from unidentified sources from February 1, 1990, through the last entry in July 1990. Ken acknowledged that the electrician's lien against the house had been paid with community funds deposited in the EDJ account. Once the donated funds in the EDJ account were exhausted by October 1989, all deposits thereafter in the EDJ account must be presumed to be community. Nancy should have been granted reimbursement for one-half of the $1,200 paid to satisfy the electrician's lien on March 30, 1990.
The trial court also failed to consider that, whether the donated funds were separate or community, the interest earned by the EDJ account was community property because Ken made no declaration reserving the fruits of the donation as his separate property. La. C.C. art. 2339. Any amounts exceeding the donations from Mr. Byrd that were spent on the new home are community amounts, subject to reimbursement. La. C.C. art. 2366.
Ken testified his uncle gave him $22,549, $32,095 and $67,000 and produced copies of cashier checks for the latter two amounts. He said he initially deposited $54,644 in the EDJ account from his uncle's investment accounts, the sum of $22,549 and $32,095. He explained that the $56,472.25 in the EDJ account before construction began in February 1989 included interest earned on the $54,644.
The record allows us to conclude that Ken received $121,644 in donations from his uncle which was expended on the construction of the new home.
The check register on the EDJ account shows that a total of $70,306.10 was paid out of the EDJ account directly to the contractors and material suppliers and that a total of $52,000 from the EDJ account was deposited *737 into the ONB account between August 9, 1989, and September 29, 1989, when the last of the many checks (totaling $51,875.27) for construction-related costs, during the period of construction from March to September 1989, were written on the ONB account.
Besides those amounts paid out before the donated funds were transferred to the ONB account and after the donated funds were exhausted, $122,181.37 from the ONB and the EDJ accounts was spent on construction costs between March and September 1989. Since this total exceeds the donations of $121,644, it must be presumed that the excess of $537.37 was paid with community funds.
Nancy claims a $5,000 payment on February 27, 1991, to settle a lien dispute was also made with community funds. However, we find the record supports the trial court's conclusion that no reimbursement is due for that payment in light of the testimony that the $5,000 was donated to Ken individually by his mother.
We conclude Nancy is entitled to reimbursement for one-half of $12,157.79 plus $537.37 for community funds spent on the house without corresponding transfers of separate donated funds from the EDJ account. She is also entitled to reimbursement of one-half of the $1,200 paid to extinguish the electrician's lien on March 30, 1990. Thus, reimbursement should have been awarded for one-half of $13,895.16, or $6,947.58, for community funds used to improve Ken's separate property under La. C.C. art. 2366. The judgment will be amended accordingly.

EQUALIZING PAYMENT AND CREDIT
The trial court found that the value of all community property, consisting only of movables, amounted to $34,122.58, so that each spouse should receive $17,061.29. Ken was awarded property valued at $24,690.58. Nancy was awarded property valued at $9,432.00 plus an equalizing payment of $7,629.29. The lawn mowers are discussed infra.
The trial court granted Ken a credit for $5,300.00 for the "advances" earlier mentioned [the $5,000 support and alimony and the $300 television]. Nancy conceded that the $300 should be credited. She disputed that the $5,000 was an advance against her community share.
Ken claimed the $5,000 was designated as half alimony and half child support because an income tax liability would result if it was paid as part of the community property settlement, but it was actually intended to be an advance payment of Nancy's share of the community property. Nancy claimed the $5,000 lump sum was part of the agreement regarding alimony and child support and the consideration for the payment was her relinquishment of any further claim for alimony or child support besides the amounts agreed upon.
We have nothing in the record to demonstrate what Ken's obligations for alimony or child support might have been absent the agreement. The ex-spouses obviously recognized that a move from the house, where Nancy had no house payment or rental expense, to a rented apartment would increase her living expenses. Such a change would have increased Ken's potential alimony obligation.
The minute entry in the divorce proceeding states in part:
... Mr. Purcell will pay $500.00 per month child support and $500.00 per month alimony pendente lite (permanent and temporary) for the next five years ..., lump sum of $5,000 half designated as alimony and half as child support will be paid toward the purchase of a vehicle and will be payable upon Mrs. Purcell vacating the family home ...
The minute entry was made and recited in open court by counsel for the respective litigants. The specific consideration for the lump sum payment was not stated. Neither of the party's attorneys in that proceeding testified at trial.
The express language of the agreement, as recited, does not support Ken's contention that the $5,000 payment was intended as an *738 advance on the community property settlement. We do not find persuasive his confusing explanation that the lump sum payment was designated as alimony and child support, rather than as an advance on the community property settlement, solely out of concern for Nancy's potential tax liability. Nancy's liability for tax on alimony payments is evident. Ken's child support payments may have entitled him to claim his daughter as a deduction.
Article 3071 of the Louisiana Civil Code provides:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
The contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.
Article 3073, on the same subject, further provides:
Transactions regulate only the differences which appear clearly to be comprehended in them by the intentions of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.
The renunciation, which is made therein to all rights, claims and pretensions, extends only to what relates to the differences on which the transaction arises.
We consider the minute entry a transaction and compromise under La. C.C. art. 3071. The recitation of the agreement in the record contains no reference to community property issues. The transaction and compromise was entered into on July 5, 1994.
The partition action was not filed until January 12, 1995.
The transaction regulates only the differences clearly comprehended by the intention of the parties. The agreement clearly omits, and does not cover, any community property matters. Such issues normally are not ripe for determination until the termination of the community, so a credit against any amounts owed in the community property partition is not a necessary consequence of what was expressed in the agreement. Nor does it relate to the differences on which the agreement arose, i.e., custody, child support and temporary and permanent alimony.
The trial court's conclusion that the parties intended the $5,000 lump sum as an advance on the community property partition, based solely on Ken's testimony, and in disregard of the express language in the minute entry, must be found clearly wrong, legally and factually. The judgment will be amended accordingly.

THE LAWN MOWERS
Nancy complains of the trial court's refusal to assign a value to a John Deere lawn mower which Ken admitted he had in his possession at the time of trial. The trial judge found that the parties had failed to prove the value of the lawn mower adequately. Two lawn mowers were purchased during the marriage between Ken and Nancy, one of which was a Murray and the other of which was a John Deere. Nancy had the Murray after the separation of the parties, and Ken had the John Deere.
Nancy testified she gave the Murray lawn mower away because it was inoperative and had been taken apart. Ken maintained the Murray lawn mower only needed routine maintenance and repair. He said it was worth $450. Ken also testified that the John Deere mower was worth more than the Murray, but he did not recall his estimate. There was only one mower on Ken's list and he showed it as being in Nancy's possession at a value of $600. Nancy claimed the John Deere was worth at least $450. There was only one mower on the list prepared by the *739 notary and it was shown as being valued at $450.
Since each of the parties received a lawn mower in the distribution of property, and there was no stipulation or clear evidence as to the value of either mower, the trial court's elimination of the one mower from the final calculation of the allocation of property between the parties was not manifestly erroneous.

DECREE
The judgment of the trial court is amended to reduce the $5,300 credit to $300 and to increase the equalizing payment owed to Nancy Carol Purcell by Kenneth Wayne Purcell from $7,629 to $14,246, after the credit is allowed. The judgment, as amended, is affirmed. Costs of this appeal are assessed to Kenneth Wayne Purcell.
NOTES
[1] Ken testified that this amount represented the original deposit of $54,644 plus interest.
[2] The list of checks on the ONB account gives the date as 1989, but the copy of the check itself shows the accurate date to be 1988.
[3] This amount represents the $67,000 donation, initially invested in Robert Thomas Securities where it earned interest, and deposited to the EDJ account when construction began on the new house.
[4] Ken said this purchase was made with $5,000 of the $29,000 proceeds from the sale of the first family home, plus a little interest earned on that money.
[5] Ken stated this purchase was made with the remainder of the $29,000 net proceeds from the sale of the community home.
[6] The notation says that a $22,000 check was written directly to the contractor, but the money appears to have been deposited in the ONB account and a check written on that account to the contractor's company on 8/9/89 for $22,000.
[7] Checks were written on the ONB account to subcontractors and suppliers of materials on the new home totaling $9,178 between August 11, 1989 and August 31, 1989.
[8] Checks written on the ONB account for construction costs of the new home between September 6 and September 29, 1989 totaled $20,697.
[9] No notation was made that this was for construction costs, nor any checks written out of the checking account for construction costs until almost two months later.
[10] The notation explaining the reason for the transfer is illegible.
[11] Notation says "for Wallace." On 2/1/90 a check for $ 1919 was written on the ONB account to pay a Wallace lien. By September 29, 1989, a total of $122,181 had been drawn from the EDJ account and expended for construction costs of the new house, more than the amount of the donations of $121,644.
[12] The balance before this transaction was shown as $906. A transfer was made to checking of $2,501 and the new balance was shown as $3,408, indicating a deposit of $5,000 was made at the same time the transfer was made.
[13] Notation was "for bills."
[14] Notation was "for bills."
[15] Source not indicated.
[16] The checks related to construction costs and other expenses for the house and lot, Ken's separate property, written on the community ONB account from November 30, 1989 through December 1, 1991 totaled $6,925, with no corresponding transfers from the Ken Purcell EDJ account. The donated funds were exhausted shortly after the family moved into the new home in September 1989.
[17] There was a payment out of the ONB account of $22,000 to Ashley Construction dated August 9, 1989, but the EDJ records show a corresponding withdrawal on July 31, 1989. Thus, we infer that Ken covered the $22,000 to the contractor with the money withdrawn from the EDJ account, even though a deposit to the ONB account was not specifically noted.